1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
2                 FORT WORTH DIVISION

3   UNITED STATES OF AMERICA        )   4:17-CR-156-O(2)
                                    )
4   v.                              )   Sentencing
                                    )
5   SCOTT MATTHEW GOSS              )   January 16, 2018

6

7          BEFORE THE HONORABLE REED C. O'CONNOR
                United States District Judge
8                 In Fort Worth, Texas

9

FOR THE GOVERNMENT:              **MR. SHAWN SMITH**
10                                 US Attorney's Office
                                 801 Cherry St
11                                 Burnett Plaza Ste 1700 Unit #4
                                 Fort Worth, TX 76102-6882
12                                 817/252-5200
                                 Fax: 817-252-5455
13

FOR THE DEFENDANT:               **MR. RANDALL H. NUNN**
14                                 Law Office of Randall H. Nunn
                                 PO Box 1525
15                                 Mineral Wells, TX 76068
                                 940/325-9120
16                                 Fax: 940/325-9124
                                 rhnunn@sbcglobal.net
17

COURT REPORTER:                  **MR. DENVER B. RODEN, RMR**
18                                 *United States Court Reporter*
                                 5124 Breezewind Lane
19                                 Fort Worth, Texas  76123
                                 *drodenrmr@sbcglobal.net*
20                                 Phone:  (214) 753-2298

21

22      The above styled and numbered cause was reported by
    computerized stenography and produced by computer.
23

24

25

1          (January 16th, 2018.)

2               **THE COURT:**  All right.  This is case number

3     4:17-CR-156, the United States versus Scott Matthew Goss.

4     Mr. Smith is here for the Government.  Mr. Nunn is here for

5     the Defendant.

6               Sir, would you state your full name for the record.

7               **THE DEFENDANT:**  Scott Matthew Goss.

8               **THE COURT:**  Okay.  Thank you, sir.  We are here for

9     purposes of your sentencing.

10              Counsel, did you and your client receive a copy of

11     the Presentence Investigation Report and the Addendum?

12              **MR. NUNN:**  Yes, we did, Your Honor.

13              **THE COURT:**  And have you gone over those documents

14     with your client?

15              **MR. NUNN:**  Yes, I did, Your Honor.

16              **THE COURT:**  All right.  Did the Government receive

17     these documents?

18              **MR. SMITH:**  Yes, Your Honor.

19              **THE COURT:**  Now, you have filed a number of

20     objections to the documents going mostly to the drug amounts

21     as well as the gun enhancement.  I'll turn the floor over to

22     you to present any evidence or make any arguments you would

23     like to make on your objections.

24              **MR. NUNN:**  Thank you, Your Honor.  Your Honor, the

25     objections that we have, they all related to, as I said, to

1    the quantity, whether purchases should be counted toward the

2    drug quantity as opposed to distribution quantities, the

3    number of occasions and the quantities as being unreliable and

4    inaccurate and the multiplier method that was used here to

5    multiply a number of occasions times a quantity we objected to

6    that also based primarily on some cases from other circuits

7    more than here which say the multiplier method or any of the

8    factors in that equation are not based on some specified

9    either drug weight, drug amount, or a specific date, that it

10    makes that whole multiplier inaccurate and for that reason we

11    objected to it because we believe that it exaggerates the

12    quantities.  Mr. Goss is not disputing that he was involved or

13    disputing his conduct, but what we are doing is objecting to

14    that method as being inaccurate.

15         We also had an objection to a criminal history point

16    issue, but that involved only one point.  That would make no

17    difference here, so I won't spend any time on that.

18         The question I think on the quantity, when you look

19    at the quantity that's set forth in the PSR, it lists four

20    different people or groups of people that reported certain

21    quantities in the reports of investigation.  Those statements,

22    none of them have any specific drug weight.  None of them, not

23    one, had any specific drug quantity to start off to use as a

24    mistaken ground to say, okay, this is a quantity.  Also, none

25    of them involved a specific date at all.  The closest to it

1    was a statement by Whitten that said sometime in 2013.  That

2    one I think is suspect simply because the date used here for

3    the conspiracy beginning point was December 31st, 2013, so I

4    would say that it's doubtful that one day is when that

5    happened.  But in any event I think it shows the difficulty

6    here in arriving at an accurate, reliable quantity based on

7    multiplier method and the reason I think in this case it's

8    particularly significant is that the Presentence Report said

9    in paragraph 10 that that Mr. Goss received and distributed

10   methamphetamine alone and sometimes in partnership with others

11   involved in the conspiracy.  He submitted a declaration in

12   which he explained his personal use, his addiction, how much

13   he thought that he used out of what he bought and so forth and

14   I think it's significant here because when the PSR

15   acknowledges that he received and distributed methamphetamine

16   alone, I think what that's saying is there's certain

17   quantities here that have nothing to do with the conspiracy

18   and that's recognized and admitted in the PSR.

19          Trying to get your hands around this where you have

20   no dates and no specific quantity is very difficult.  The

21   closest that I think that I could come to it would be to use

22   his personal drug use amounts as a proxy, if you will, for

23   what are the amounts that he received and distributed alone

24   versus the other.

25          So given that, we have filed a motion for a variance

1    in which we ask for I think a two level variance downward.

2    That motion was filed on the same day that the Addendum was

3    filed.  I did not look at the addendum until after we got our

4    things filed, I think that evening, and then I looked at the

5    Addendum and the Addendum further said it was not possible to

6    calculate a methamphetamine quantity directly sold by the

7    Defendant as the investigation did not contain information

8    directly related to the Defendant's distribution activities.

9            After I looked at that, I realized that, well, it is

10   possible, because if those people used in that calculation box

11   in the PSR are the same ones we are talking about, they used

12   that to calculate amounts, possessed amounts distributed, and

13   amounts purchased.  Well, you look at those same reports of

14   investigation for those same individuals and it comes out with

15   a quantity that he either obtained or distributed, those are

16   the words used, and that quantity comes up to 141.75 grams

17   that he distributed, according to that.

18           So after I looked at that I realized if you look at

19   the amounts distributed, that's what it comes up to with those

20   same people and you do have the same method that you used to

21   multiply the other things.  You use that same method, say,

22   here are the people that said that.  There's only one person

23   in there that said anything about distribution and that's

24   Mr. Baker; and that's where the 141 comes from.

25           So after looking at that, Your Honor, I felt that if

1    that's the case then the variance that we had asked for, too,

2    was much less than it really should have been because that's

3    almost a nine, ten level downward thing, if you used the 141.

4            I recognize that there's some question about how you

5    deal with this in this circuit, but I also looked at cases

6    from other circuits primarily that have used a discount factor

7    to discount that quantity when there's uncertainties and I

8    think there's uncertainties here primarily because he received

9    and distributed meth alone and that's acknowledged, so it

10   seems to me that if you use the discount factor, that's

11   another way of arriving at something that has more

12   reliability, more certainty to it than what we have now.

13           There's a Ninth Circuit case that used the discount

14   factor 50% of the quantity where they had uncertainties of a

15   similar type thing.  There's one in the Fourth Circuit of 40%.

16   There's one in-between, 20 and 50%.

17           So what we would ask is that the variance motion I

18   believe should actually be a request for a variance of, let's

19   say, nine or ten levels.  I know he is subject to a mandatory

20   minimum of 60 months, so I think it probably would work out at

21   nine levels.

22           I just wanted to explain that to the Court because I

23   didn't want you to think that changing based on nothing, but

24   it's just these statements with respect to this receiving and

25   distributing alone and his personal use, his declaration, and

1  the fact that most of these reports of investigation that we

2  use in the calculation really said nothing about distribution

3  except one of them, but he did say about distribution, we are

4  not contesting that, we are not contesting that he was

5  involved, that he distributed, we are simply contesting that

6  the multiplier method in this case we think is very unreliable

7  and we think it leads to an inflated result.

8          THE COURT:  Are there two issues that you are

9  bringing up, you call it the "multiplier method," and then is

10  that separate from what I understand part of your objection to

11  be or part of the affidavit to be is that he was using,

12  according to his affidavit, 75% of what he was acquiring.  Are

13  those two different issues?

14          MR. NUNN:  No, sir.  I think they're both related

15  because --

16          THE COURT:  They're clearly related.  But, I mean,

17  are they two different legal considerations?  The analysis are

18  different.  In other words, the "discount method," as you call

19  it, isn't that simply consistent with the Guideline provision

20  that requires when the information is not entirely clear

21  requires me to come up with, using reliable information, to

22  come up with a reasonable estimate of what the drug quantity

23  is?  Are we --

24          MR. NUNN:  Yes.

25          THE COURT:  Is that consistent with, in your view,

1   the Ninth Circuit and the Fourth Circuit and their discount

2   method application?

3         MR. NUNN:  Yes, sir.  I think it is.  I think the

4   declaration, the personal use, I realize that there are --

5   there are cases that say when you are dealing with a

6   conspiracy, personal use --

7         THE COURT:  That's my question.

8         MR. NUNN:  -- does not play into that.

9         THE COURT:  That's my question.  So you have the

10  argument of the discount factor issue.

11        MR. NUNN:  Yes, sir.

12        THE COURT:  Separate from that you have an objection

13  that, according to the affidavit, 75% of this quantity should

14  not be used to calculate his guidelines.  Whatever quantity I

15  rely on at the end of the day --

16        MR. NUNN:  Yes, sir.

17        THE COURT:  -- 75% of that should not be used to

18  determine the drug quantity level because 75% of it your

19  client used for his own personal purposes; he did not sell or

20  intend to sell 25% of it.

21        MR. NUNN:  Yes, sir.

22        THE COURT:  Are there cases that support that part of

23  your argument; that is, personal use amounts should not be

24  used to calculate drug quantity levels?

25        MR. NUNN:  Your Honor, I think the closest that I've

1    seen to that, I think there's a Ninth Circuit case that

2    there's language in it that would lead you to believe that

3    that issue of personal use quantity is not totally foreclosed

4    and so looking at those it seemed to me that it's in the

5    alternative, number one, and I've seen a couple of dissents

6    that also have taken the view the personal use quantities

7    should not be included.  If you have possession with intent to

8    distribute and you don't count there, then why do you count in

9    it a conspiracy.  So I've seen some dissents and I've seen

10   some language which appears to leave the door open primarily

11   out of the Ninth Circuit.

12           So, in the alternative, it seems to me that the

13   multiplier method, that has a broader acceptance among other

14   circuits and when they use it they also talk about you can't

15   base a consumption that is a mere allegation that's

16   unconnected to something specific in either weight or specific

17   date that you first find and say, okay, we have a weight here,

18   so we know it's been this, and would have used that as a -- as

19   one of the factors in the multiplier.

20           So I guess what I'm saying is, I can't honestly say

21   that Fifth Circuit law goes with us one hundred percent on the

22   question of personal use quantity, so that's an alternative

23   argument.  I think it's being recognized some in the sense and

24   some where it's unclear what the holding really said on that,

25   but on the multiplier method itself and the discount, I think

1    that's a much more widely accepted argument on that and that's

2    the one that we are certainly advancing.

3           THE COURT: All right. Mr. Smith, what do you say?

4           MR. SMITH: The case law is clear in the Fifth

5    Circuit anyway on personal use amounts. So even if the Court

6    were to accept that 75% of the methamphetamine the Defendant

7    received he used, that still counts. That case law is settled

8    on that.

9           THE COURT: Is it different for conspiracy cases

10   versus possession with intent to distribute cases?

11          MR. SMITH: I believe it is. Yes, Your Honor.

12          THE COURT: And because this is a conspiracy case the

13   75% figure, in your view, the case law would say you would

14   include that amount?

15          MR. SMITH: On conspiracy. Yes, sir.

16          THE COURT: All right.

17          MR. SMITH: Yes. And I don't that's even really a

18   factual issue here because as I read the Addendum,

19   specifically the response on the top of page 3, the Addendum

20   states: "As referenced in paragraphs 13, 15, 16, 17, and 18

21   of the PSR the quantity seen in the Defendant's possession

22   were specifically excluded from Guideline computation," so I

23   think that these smaller amounts that Mr. Nunn is referring

24   to, for the most part, were excluded from the calculation --

25   from his drug quantity calculations. As far as the next I

1    think major point or the next -- That's one issue.

2          The next primary issue of Mr. Nunn's is it's hard to

3    gauge the way things occurred and that's why in the

4    Government's response to the Addendum it's important to

5    understand the context of it when the interview is occurring

6    and when it actually occurred, so when these arrests occurred,

7    and I want to point out that on page 3 of my Response I note

8    that Ms. Sarah Kirkpatrick was arrested in June 2015.  I went

9    back and looked and she was released from bond -- she made

10   bond on that case and got arrested again in November 2015, so

11   she was arrested twice in 2015 and then by the end of 2015,

12   rather, she is in custody, you know, she started doing -- was

13   in custody for good until she finished up her BOP sentence.

14   So based on the information there, and also the Defendant's

15   Factual Resume where he stipulated to I believe 2015 and '16

16   being involved -- yeah, 2015 and '16 -- so we know with

17   reasonable certainty that the Defendant was involved in 2015

18   and '16 with some of these proffers the Government offered.

19   We know that's even in 2014 and before.

20         As the Court is aware in this run of Defendants, it's

21   almost a continuous course of conduct.  That's what these

22   proffers kind of elaborate on is, you know, whoever has the

23   meth at any point in time, it can be the supplier or the

24   distributor and/or the recipient of the methamphetamine, it's

25   a very fluent situation, and that's why it's hard to pin down

1   an exact date and these proffers and the testimony --

2         THE COURT:  Why don't we go ahead and take evidence

3   on those facts.

4         MR. SMITH:  Okay.

5         THE COURT:  Because that goes to the reliability.  So

6   why don't you and your client have a seat there.

7         Mr. Finney, if you would raise your hand.  Agent

8   Finney, if you would raise your hand and be sworn.

9      (Witness sworn.)

10         **BRIAN FINNEY, GOVERNMENT WITNESS,** was sworn

11                    **DIRECT EXAMINATION**

12   BY MR. SMITH:

13   Q.  Would you please state your name.

14   A.  My name is Brian Finney.

15   Q.  And your current occupation.

16   A.  I'm a Special Agent with the Drug Enforcement

17   Administration, currently assigned to the Fort Worth, Texas,

18   office.

19   Q.  And you're one of the case agents on the case?

20   A.  Yes, I am.

21   Q.  And you are familiar with the facts of Mr. Goss's case?

22   A.  Yes, I am.

23   Q.  It looks like a number of people have provided information

24   on Mr. Goss.  Is that right?

25   A.  Yes, sir.

1   Q.  Starting with Candace Whitten, Lee Baker,

2   Sarah Kirkpatrick, and Celeste Blair.  Is that right?

3   A.  That is correct.

4   Q.  Let's start with Candace Whitten.  What information did

5   Ms. Whitten provide about Mr. Goss?

6   A.  Ms. Whitten stated that she had witnessed Mr. Goss

7   receiving 4 ounces of methamphetamine on one occasion in 2013

8   from a codefendant Robin Hughes and that on that occasion

9   Mr. Goss was also in possession of a firearm.

10  Q.  Did she say anything else about Mr. Goss that you have in

11  front of you there?

12  A.  That's all I have, sir.

13  Q.  Okay.  Let's go to Mr. Baker.  And what did Mr. Baker

14  state about Mr. Goss?

15  A.  Mr. Baker identified Mr. Goss as one of Mr. Baker's

16  customers.  He stated that on approximately 50 occasions --

17  Q.  Is that five-zero?

18  A.  Five-zero, Mr. Baker supplied Mr. Goss with 2 ounces of

19  methamphetamine and on an additional 100 occasions Mr. Baker

20  supplied Mr. Goss with 1 ounce.  He then went on to talk about

21  some of Mr. Goss's customers and some of these smaller amounts

22  that he had observed Mr. Goss apply to these customers.

23  Q.  And who was -- What information does it say there about

24  that?

25  A.  He identified one customer that was receiving 1/8th ounce

1    quantities on 10 occasions.

2    Q.  Did you say "8" or "1/8th"?

3    A.  1/8th of an ounce.

4    Q.  Okay.  From Mr. Goss?

5    A.  From Mr. Goss to this unnamed customer.

6    Q.  Okay.  That would be Baker --

7    A.  His name is just redacted.

8    Q.  That Lee Baker had --

9    A.  Mr. Baker witnessed these transactions.

10   Q.  Okay.  Go ahead.

11   A.  Mr. Baker then identified a second customer of Mr. Goss's

12   that Mr. Baker observed him supply quarter ounce quantities on

13   10 occasions and then over a three month period on a daily

14   basis supplied the same customer quarter and half ounce

15   quantities and then a third customer -- Mr. Baker identified a

16   third customer of Mr. Goss's that Mr. Baker observed Mr. Goss

17   apply a 1/6th, an 1/8th of an ounce quantities on 10

18   occasions.

19        So a total of -- In conclusion, Mr. Baker identified

20   Mr. Goss as a customer of his and then identified 3 or 4

21   customers of Mr. Goss's that Mr. Baker had observed Mr. Goss

22   distribute methamphetamine to.

23   Q.  Okay.  So that would be 4 ounces -- So where we are now is

24   4 ounces approximately from Candace Whitten attributed to

25   Mr. Goss and then excluding the amounts that Mr. Baker

1    witnessed Mr. Goss distribute, what quantity did Mr. Baker

2    attribute to Mr. Goss?

3    A.  At least 200 ounces.

4    Q.  Okay.

5    A.  As Mr. Baker distributing that to Mr. Goss.

6    Q.  Okay.

7    A.  So to avoid any double counting, if we didn't count what

8    then went to the customers, if you just went with what

9    Mr. Baker gave to Mr. Goss, there's 200 ounces.

10   Q.  Okay.  And, obviously, an ounce -- one ounce and two ounce

11   quantities are distributable amounts of methamphetamine?

12   A.  Correct.

13   Q.  All right.  What did Ms. Sarah Kirkpatrick say about

14   Mr. Goss?

15   A.  She identified Mr. Goss as a partner or working in

16   conjunction with Celeste Blair.  They were -- She describes

17   him as partners.  She says that she was originally introduced

18   to Kirkpatrick -- I mean, Kirkpatrick was introduced to

19   Celeste Blair and Scott Goss by Lee Baker, who we just

20   testified about.  Ms. Kirkpatrick says she obtained a 1/16th

21   of an ounce on two occasions from Scott Goss and then that she

22   had also witnessed Goss and Blair in possession of two ounce

23   quantities on eight occasions and one ounce quantities on six

24   occasions.

25   Q.  So excluding the amount that Kirkpatrick says she got from

1   Mr. Goss, what -- how much methamphetamine does she attribute

2   then total to Mr. Goss?

3   A.  Approximately 22 ounces.

4   Q.  Okay.  And that leads us to Ms. Blair, I think.

5   Celeste Blair.  What did she say about Mr. Goss?

6   A.  I don't have any -- I don't have her report with me.  I

7   apologize.

8   Q.  I think it's in the Addendum.

9   A.  Blair identified Mr. Goss as a customer of hers whom she

10  had delivered one ounce of methamphetamine on six occasions

11  and a half ounce on another ten.

12  Q.  And did -- how did she -- Did she describe Mr. Goss in the

13  same way that Kirkpatrick had described Mr. Goss?

14  A.  Celeste Blair describes him as a customer of hers, not so

15  much a partner, just a customer; whereas Ms. Kirkpatrick

16  described him as partners or working in conjunction.

17  Q.  What would the aggregate -- What would the total be then

18  that Ms. Blair attributes to Mr. Goss?

19  A.  11 ounces.

20  Q.  Okay.  And Ms. Whitten, Mr. Baker, Mr. Kirkpatrick, and

21  Celeste Blair, have you found -- has the investigation found

22  they have provided credible and reliable information about the

23  Defendant and others in this information?

24  A.  Yes.  Specifically, Whitten and Kirkpatrick have testified

25  at least once in trials for us.  Yes, they -- Those two

1    specifically have been I think proven credible in multiple

2    courts based on their testimony.  But, yes, I would also agree

3    that Baker and Celeste Blair have also been truthful and

4    honest.

5         MR. SMITH:  No further questions, Your Honor.

6                    CROSS-EXAMINATION

7    BY MR. NUNN:

8    Q.  Mr. Finney, these reports of investigation where they talk

9    about quantities, as they say ounces or quarter ounce or

10   whatever, these are all based on eyewitness views of drugs in

11   a baggie or in some kind of container?

12   A.  Yes, sir.

13   Q.  They're not weighed or measured amounts in any case, are

14   they?

15   A.  Not necessarily, no.  Many times they are weighed and

16   measured because there's a transaction taking place, so it is

17   put on a scale, but these people have a unique ability that

18   maybe you and I don't have because they live in this world,

19   they distribute drugs, they use drugs.  They can look at a

20   baggie of dope and very accurately tell you how much

21   methamphetamine is in that bag based on what -- in law

22   enforcement we call it training and experience and in their

23   world it's just being a user, a distributor, that they can

24   look at a bag of dope and give you a very close estimate of

25   how much dope is in that bag.

1  Q.  Okay.  And they can do that 50 times or 100 times?

2  A.  I think that, depending on who you want to talk about, but

3  if they are -- If they are on a daily basis themselves in

4  possession of a bag with two ounces or a bag with an eight

5  ball or you name the quantity, that they can look at that

6  baggage and they know how much methamphetamine is in there or

7  they are very close.  It would be different for you maybe as

8  someone who is not a methamphetamine user or distributor to

9  look at that bag and know how much bag is in there, but for

10 someone who's involved in this lifestyle and use of

11 methamphetamine for years, it's not difficult for them to look

12 at a bag of dope and know how much dope is in that bag

13 within --

14         THE COURT:  Is it important -- Is it important that

15 they be able to do that?

16         THE WITNESS:  Absolutely.  Yes.

17         THE COURT:  Why is that?

18         THE WITNESS:  Because when they're purchasing

19 methamphetamine or when they're distributing methamphetamine,

20 if there's not a scale available they need to be able to know,

21 well, that that's a quarter ounce or that's an ounce.  There's

22 a -- It's about money.  So they're --

23         THE COURT:  It's their business?

24         THE WITNESS:  Absolutely.

25 BY MR. NUNN:

1    Q.  I know you've looked at a lot of police reports, reports

2    of investigation on drug cases.  Isn't it true that in many

3    cases when the police apprehend someone they will in their

4    report specify the quantity that they suspect or think is in

5    that amount that they arrested them with?  Very often they put

6    that in their report, do they not?

7    A.  They don't put in -- I think you said "but they suspect."

8    If a police officer seizes methamphetamine from someone, that

9    methamphetamine generally is weighed when it is being

10   submitted to the laboratory, so if we are talking about a

11   police report --

12   Q.  Right.

13   A.  -- where something is seized, that will be more specific

14   because it is being submitted to a laboratory.

15   Q.  Right.  Even those amounts in many reports when they go to

16   the lab the weight of that is different than what was

17   suspected when the person was arrested at the scene; correct?

18   A.  I think you're referring to on the lab reports where it

19   comes back actual methamphetamine as opposed to mixture and

20   substance.  If a bag contains 8 grams of mixture and

21   substance, it may only contain grams 5 grams of actual and 3

22   grams of cut.  There is a discrepancy there, but the totality

23   of the crystal -- of what the person believed, they believed

24   there was 8 grams in that bag, whereas the actual may only be

25   5 grams and 3 grams of cut.

1  Q.  Well, I guess what I'm saying is that in many police

2  reports there will be an amount specified at the initial stop,

3  as they'll say, you know, approximately a half an ounce of

4  methamphetamine and then when that gets back and is weighed it

5  turns out to be something somewhat different, could be more,

6  could be less, but it very seldom is exactly right on it.

7  Isn't that correct?

8  A.  I guess if we are talking about partial grams, yes.  Maybe

9  the difference in the weight of a scale within, you know,

10  2/10ths of a gram, yes.  But again, I think you are arguing

11  mixture and substance versus actual.

12        And again, you keep referring to police reports and

13  I'm going to say in police reports that it is weighed because

14  it's being sent to a lab and so the substance that the lab

15  tests will be very close, within tenths of grams, to what

16  is -- what's seized.

17  Q.  Okay.  Well, I think that's partially the point that I'm

18  trying to get to, within a tenth of a gram or something.  Here

19  where someone who says 50 times at 2 ounces, 100 times at 1

20  ounce, and you multiply that out and this is something that a

21  person will spend time in prison for that and so if it's a

22  tenth, that means something to that person and it also, I

23  would think, call into question maybe the accuracy.  Could it

24  have been instead of 50 times, could it have been 49 times;

25  could it have been 48; could it have been 51.  What would your

1   answer be?  Did you ask Mr. Baker that question?

2          THE COURT:  Let me ask it this way:  So you've

3   testified that these people who are consistently in this

4   business --

5          THE WITNESS:  Yes, sir.

6          THE COURT:  -- have an eye for or a feel for the

7   weight involved in that transaction.  They either measure it

8   out with a scale or if they don't have that available have it

9   in some container, bag, whatever that they use for certain

10  sizes, they are able to estimate it pretty close to the amount

11  because it's their livelihood, they don't want to pay more for

12  what they're not getting nor do they want to sell for more

13  than what they're charging.  So let's set that aside for a

14  moment, the amounts.

15          Why is it that you believe that in these interviews

16  where someone says I sold on 10 occasions or on 50 occasions

17  these amounts, why is it that you think that both of those

18  numbers are true, both the number of times that they sold and

19  the amounts related to those number of times?

20  A.   There's multiple factors.  Specifically, we have a

21  knowledge of the individual that we're talking to and the

22  general weights that they deal in whether they are receiving

23  methamphetamine or distributing methamphetamine, so we have an

24  idea based on just our investigation of how much

25  methamphetamine they are receiving and distributing and then

1   most of the time we are able to corroborate that by text

2   messages, *Facebook* messages, that that's the kind of amounts

3   that they are generally dealing.

4           And we're conservative.  There's sometimes I think a

5   misconception.  We are conservative when we ask these numbers.

6   We ask them to give us the lowest possible realistic number,

7   you know.  So if you think it's 10 to 20, we will go with 10.

8   We're not trying to pile on.  But that's what I would say.

9           THE COURT:  And then why, in your view, is it the

10  case that they say 10 to 20 or 10 without any dates, Christmas

11  and one week thereafter was another one and a week --

12          THE WITNESS:  Yes, sir.  Some of that would go to --

13  I think we've gotten better about some of that more recently

14  about trying to pin down more dates.  In many of the early

15  interviews a lot of times we didn't ask the date questions.

16  We've gone through this enough now that we're getting hit with

17  that a lot, so we ask that more now.  But a lot of times

18  they're in this conspiracy for so many years and it goes on

19  for so long that it really is years at a time.  Sometimes, you

20  know, they can't say, "Well, I was arrested -- I was arrested

21  in June.  I never dealt with this person before I got

22  arrested," so we are able to pinpoint more dates.  But I would

23  say in the older ones we didn't ask those questions

24  necessarily.  We've started doing that now.  But again,

25  sometimes the drug relationship is so long, it really will be

1   2013 and 2014.

2            THE COURT:  Go ahead.

3   BY MR. NUNN:

4   Q.  It's true, is it not, that Mr. Baker said that he got out

5   of distributing methamphetamine in about June of 2015?

6   A.  I don't know that specifically.  I have the report here in

7   front of me.  I can look for that, if you want.

8   Q.  Well, there's a couple of reports.  I'm virtually sure

9   that in one of them he used that date, June 2015, he said I

10  was no longer involved in methamphetamine distribution.

11  A.  I don't recall.  I mean, I have one report here.  If you

12  can point me to where it is in here, I will be happy to look

13  at that for you.

14  Q.  It's not in this report you're using there.

15  A.  I don't know that specifically, no, sir.

16  Q.  Okay.  You heard when I was coming up with the calculation

17  that I had the amounts that Mr. Baker talked about for

18  Mr. Goss.  Do you agree with the quantity that I said was

19  141.75 grams that he said that Mr. Goss distributed or sold?

20  You can look at --

21  A.  No.  No.  No.  I want to make sure I understand what

22  you're asking.

23  Q.  Just -- I'm asking if you are in agreement with that

24  amount.  I'm not --

25  A.  If I'm in agreement that Baker says that Goss distributed

1    that much or that Goss received that much from him, because

2    Mr. Baker --

3    Q.  No, he distributed.  If you look in that report of

4    Mr. Baker's, there's paragraph 48, 49, and 50.  He identifies

5    somebody as a customer to whom Goss had distributed 1/8th of

6    an ounce on more than 10 occasions; 49, similar type thing,

7    distributed 1/4th ounce on more than 10 occasions; and then 50

8    identified a customer to whom he distributed between 1/16th

9    and 1/8th of an ounce on more than 10 occasions.  I used

10   1/8th, the upper end, just to be fair about it.

11   A.  That's fine.

12   Q.  What I did is multiplied those out and it came to 141.75.

13   I was just asking if your --

14   A.  I won't dispute your math.  That's fine.  Yes.

15        **MR. NUNN:**  Okay.  Thank you.  No further questions,

16   Your Honor.

17        **MR. SMITH:**  I just want to clarify one point.

18                    <u>REDIRECT EXAMINATION</u>

19   BY MR. SMITH:

20   Q.  I think Mr. Nunn was talking about when officers seize

21   methamphetamine or any drug, for that matter, and there's a

22   bulk and there's a gross and a net.  The bulk weight would

23   include what?

24   A.  It would include whatever packaging that the Government or

25   the police department uses when submitting that evidence to

1  the laboratory.

2  Q.  So, for example, if you put it in a heavy bag -- If you

3  put one ounce of a product -- of a narcotic in a heavy bag or

4  multiple bags it could weigh as much as half a pound, for

5  example, but a bulk weight would be approximately a half a

6  pound.

7  A.  Correct.

8  Q.  But the gross would include -- at the lab -- would include

9  the packaging that the defendant had and the drugs?

10  A.  Correct.

11  Q.  And then the net weight is just the drugs alone that the

12  chemist has weighed?

13  A.  Correct.

14          MR. SMITH:  Okay.  No further questions, Your Honor.

15          MR. NUNN:  Just one real quick.

16                    RECROSS EXAMINATION

17  BY MR. NUNN:

18  Q.  Mr. Finney, you didn't discuss with Mr. Baker on this

19  report of investigation; or did you?  Did you get into a

20  discussion with him about heavy bags or light bags or

21  packaging or things like that?

22  A.  No.  There was no bag discussion.

23  Q.  Okay.

24          MR. NUNN:  Thank you.

25          THE COURT:  Okay.  Thank you.

1          THE WITNESS:  Yes, sir.

2          THE COURT:  Any other evidence?

3          MR. SMITH:  No, Your Honor.

4          THE COURT:  Any other evidence?

5          MR. NUNN:  No, Your Honor.

6          THE COURT:  Okay.  Very good.  Well, I -- After

7   hearing the testimony in this case, I've reviewed the reports

8   ahead of time, but the agent has testified as to why he

9   believes the information contained in the Presentence

10  Investigation Report and the Addendum are corroborative and

11  why he believes they are reliable and has explained how these

12  interviews take place and what they do to reach those

13  conclusions.  And so based upon that testimony and the

14  information provided to me in advance as well as the

15  information in the PSR and the Addendum, I find that the

16  objections should be overruled, that the information is

17  reliable, and that the information supports the calculations

18  made in the Presentence Investigation Report.

19          It also seems to me that there is a difference

20  between purchases for personal use in prosecutions for

21  possession with intent to distribute versus prosecutions for

22  conspiracy to do that and therefore, even though there is some

23  evidence that 75% of the purchases were for personal use, I

24  believe that those amounts are properly included in

25  determining the relevant conduct drug amounts in this case.

1   Therefore, that objection is overruled as well.

2           That being the case, then I adopt those fact findings

3   and the fact findings contained in the Presentence

4   Investigation Report and the Addendum.

5           I adopt the probation officer's conclusions as to the

6   appropriate Guideline calculations and determine that they

7   should be as follows:

8           A total offense level of 33.

9           A Criminal History Category of II.

10          An imprisonment range of between 168 and 210 months.

11          A supervised release range of 4 to 5 years.

12          And a fine range of between $35,000 and $5 million

13  dollars.

14          Does the Government wish to be heard on sentencing.

15          **MR. SMITH:**  No, Your Honor.

16          **THE COURT:**  Mr. Nunn, I will turn the floor over to

17  you.  I have read your sentencing memorandums and motions and

18  understand the basis for your request for a lower sentence

19  outside the guidelines as well as your request for the

20  recommendations that you asked to be made in those documents.

21  So with that stated, I will turn the floor over to you.

22          **MR. NUNN:**  Your Honor, we also had submitted a motion

23  on the previous sentence of 60 days.  Is that also --

24          **THE COURT:**  Yes.  And I have read all of what you

25  have submitted.

1      **MR. NUNN:**  Okay.  We would ask for that downward

2  departure, 60 days on that motion, Your Honor.  It seems to me

3  it fits within the Sentencing Guidelines and so we are asking

4  for that.

5      We had also ask that he be sentenced at the bottom of

6  the appropriate Guideline Sentencing Memorandum and the

7  variance -- I think we've probably dealt with all of those

8  issues.

9      I would like to, if this is the appropriate time to

10  mention it, Your Honor, Mr. Goss's mother and family are here

11  in the courtroom.

12      **THE COURT:**  If you are here with Mr. Goss, if you

13  would please stand.

14      **MR. NUNN:**  And I just want to --

15      **THE COURT:**  Thank you all for being here.

16      **MR. NUNN:**  -- let the Court be aware they were here

17  in support of him.

18      **THE COURT:**  Very good.  Thank you.  You may be

19  seated.

20      **MR. NUNN:**  And we had also asked for a recommendation

21  I think that you had referenced that closest to Fort Worth.

22      But I would like to say that I think that the

23  important thing here is that much of this conduct was driven

24  by his addiction, his personal use.  Much of his conduct we

25  believe was independent of the conspiracy and that that should

1   be taken into account.  He did not get an adjustment for a

2   minor role and we had also asked that that be taken into

3   consideration.  Given his role, whether qualified or not, we

4   think that his role was certainly different and much a

5   different situation with his personal conduct that was outside

6   of the conspiracy as reflected in the PSR and so for those

7   reasons we would ask that the Court consider that in the

8   sentence.

9         **THE COURT:**  Very good.  Mr. Goss, do you wish to

10   speak on your behalf or present information in mitigation of

11   your sentence?

12         **THE DEFENDANT:**  Yes, I do.

13         **THE COURT:**  I would be pleased to hear from you.

14         **THE DEFENDANT:**  I want to thank everyone for coming.

15   Mom.  My cousin.

16         I made some mistakes in my life, obviously.  I'm

17   registered for the TDLR.  I've a licensed electrician.  I've

18   worked all my life.  A lot of my action was driven by my

19   addiction, distribution was not, and I never have made a

20   living off of this.  My living is as a licensed electrician.

21   And I just -- I've done work all around this city.  I've done

22   work for Van Cliburn, I've done work from Eric and

23   Jenna Grubbs from Grubbs Nissan.  I've done work for Sanderson

24   Farms.  I've been down there doing camera work.  I've done a

25   lot of work.  I've done work at the star up in Frisco for the

1    Cowboys and remodel at TCU.  I've done a lot of jobs around

2    this city and I -- by far, was my income ever driven by

3    distribution of meth.  It's always been my work and I've

4    worked all my life, so -- And I just wanted you to take that

5    into account.

6            **THE COURT:**  Thank you, sir.

7            **THE DEFENDANT:**  Thank you.

8            **THE COURT:**  I will now state the sentence determined

9    pursuant to Title 18 U.S.C. Section 3553, treating the

10   Sentencing Guidelines as advisory only.

11           It is the judgment of the Court that the Defendant is

12   committed to the custody of the Federal Bureau of Prisons for

13   a period of 144 months.  This is a downward variance based

14   upon the Defendant's motion.

15           I do not order a fine.

16           I do order a mandatory special assessment of $100.

17           I do order that upon your release you be placed on

18   supervised release for a term of 4 years.

19           It is further ordered that upon your release you

20   shall comply with the standard conditions contained in this

21   judgment as well as the mandatory and special conditions

22   stated herein.

23           Have you gone over those conditions with your client?

24           **MR. NUNN:**  Yes, I have, Your Honor.

25           **THE COURT:**  I will order those conditions imposed in

1  this case.

2      As I mentioned, this is a downward variance.  I did

3  take the 60 days off and then varied downward to the 144

4  months.  I believe this is the appropriate sentence, given all

5  of the facts and circumstances, and that this sentence is

6  sufficient, but not greater than necessary, to comply with the

7  statutory purposes of sentencing.

8      Is there any objection from the Government to this

9  sentence?

10     **MR. SMITH:**  No, Your Honor.

11     **THE COURT:**  From the Defense?

12     **MR. NUNN:**  Your Honor, for the record I would like to

13  note an objection to the procedural reasonableness dealing

14  with the issue on the drug quantity and the substantive

15  reasonableness as well both for the record.

16     **THE COURT:**  Yes.  And I will overrule those

17  objections for the reasons that I have stated.  After hearing

18  the -- After reviewing in advance the objections and the

19  evidence supporting the objections and the arguments contained

20  in those pleadings as well as those made here today and then

21  after hearing the testimony today, including the

22  cross-examination and observing the agent's demeanor and

23  knowledge concerning these issues, I believe the ruling was

24  appropriate in this case, and so I will overrule your

25  procedural objection.

1            I also overrule your substantive objection because I

2    have consulted with those guidelines and then I have looked at

3    the 3553(a) factors, including your client's criminal history,

4    and have tried to take into account his criminal history

5    including, as the Government points out, the substance of his

6    criminal history, and as you point out, the low criminal

7    history category he falls in and as well as his addiction in

8    his affidavit in terms of how much he used for personal use

9    versus how much he sold and I've tried to balance all of those

10   factors to come up with this particular sentence in this case.

11   And so even if I am wrong as to your objections, this is the

12   sentence I otherwise would impose.  That objection is

13   overruled.

14           Now, I will recommend though that you be housed as

15   close to the Northern District as the Bureau of Prisons

16   possibly can house you and that if you are eligible that you

17   be able to participate in the Drug Abuse Treatment Program.

18           I will also tell you that to the extent you have the

19   right to appeal you also have the right to apply for leave to

20   appeal informa pauperis if you are unable to pay the cost of

21   an appeal and if you decide to appeal your notice must be

22   filed within 14 days, so please talk to your counsel about

23   that issue.

24           Is there anything else from the Government?

25           **MR. SMITH:**  No, Your Honor.

1          THE COURT:  From the Defense?

2          MR. NUNN:  No, Your Honor.

3          THE COURT:  Then we are in recess.  Thank you both

4     for being here and good luck.

5          MR. NUNN:  Thank you.

1          I, **DENVER B. RODEN**, United States Court Reporter for the

2     United States District Court in and for the Northern District

3     of Texas, Fort Worth Division, hereby certify that the above

4     and foregoing contains a true and correct transcription of the

5     proceedings in the above entitled and numbered cause.

6          **WITNESS MY HAND** on this 22nd day of February, 2018.

7

8

9                              /s/ Denver B. Roden

10                             **DENVER B. RODEN, RMR**
                               *United States Court Reporter*
11                             5124 Breezewind Lane
                               Fort Worth, Texas  76123
12                             *drodenrmr@sbcglobal.net*
                               **Phone:**  (214) 753-2298
13

14

15

16

17

18

19

20

21

22

23

24

25